NONPRECEDENTIAL DISPOSITION

To be cited only in accordance with Fed. R. App. P. 32.1

# United States Court of Appeals

**For the Seventh Circuit**
**Chicago, Illinois 60604**

Argued July 10, 2019
Decided July 17, 2019

**Before**

FRANK H. EASTERBROOK, *Circuit Judge*

AMY C. BARRETT, *Circuit Judge*

MICHAEL B. BRENNAN, *Circuit Judge*

No. 18-3324

| | |
|---|---|
| UNITED STATES OF AMERICA, | Appeal from the United States District |
| *Plaintiff-Appellee,* | Court for the Western District of Wisconsin. |
| *v.* | No. 17-CR-111-WMC-2 |
| OREFO OKEKE, | |
| *Defendant-Appellant.* | William M. Conley, *Judge.* |

**O R D E R**

Orefo Okeke pleaded guilty to conspiracy to commit wire fraud and money laundering, 18 U.S.C. § 371, and was sentenced to 45 months' imprisonment. At sentencing, the district court applied a two-level guideline enhancement under U.S.S.G. 2B1.1(b)(10)(C) for the use of "sophisticated means" to perpetrate his laundering. Okeke now challenges this two-level enhancement. Because the district court did not clearly err in finding that Okeke's money laundering operation involved a

greater amount of planning and concealment than the typical scheme of this sort, we affirm.

## I. Background

### A. Facts

From 2010 to 2016, Okeke's car dealership, Sysco Serve, operated as a front for his other enterprise: along with his codefendant, Clement Onuama, Okeke laundered the proceeds of nineteen fraud schemes, including romance frauds, business email takeover schemes, identity theft, and credit card fraud. Unlike Onuama, Okeke was not implicated as a direct participant in the fraud schemes. Rather, Okeke used his company's bank accounts to launder money for the fraud schemes' participants.

Fraudsters deposited money into Okeke's account, and Okeke withdrew the funds, usually within 48 hours and in increments of $10,000 or less. He then either transferred this money to Onuama's account, withdrew the money as cash or a cashier's check, or sent the money to an account in Nigeria. When bankers contacted Okeke about suspicious deposits, he responded that the transactions represented legitimate car sales. He closed accounts once a bank became suspicious, only to open new ones at different banks to continue the operation. Both Okeke and Onuama were paid a percentage for their money-laundering services. Together, the pair took approximately one million dollars in fraudulent proceeds.

Okeke and Onuama were indicted on ten counts of conspiracy and fraud. Okeke pleaded guilty to Count One, which charged him with conspiring to commit wire fraud and money laundering under 18 U.S.C. § 371.

### B. Sentencing

A probation officer prepared a presentence investigation report. He recommended an advisory guidelines range of 41 to 51 months' imprisonment. The calculation included a "sophisticated means" enhancement, which calls for a two-level increase to the base offense level if "the offense otherwise involved sophisticated means and the defendant intentionally engaged in or caused the conduct constituting sophisticated means." *See* U.S.S.G. § 2B1.1(b)(10)(C). Okeke objected to this enhancement. He argued that his offense did not involve a greater level of planning or

concealment than typical money-laundering schemes; to the contrary, he submits his lies were easily refuted.

The district court rejected Okeke's argument. First, the court explained, rather than exhibiting a "lack of sophistication," the use of an ostensibly legitimate car enterprise as a front to launder illegal profit into legitimate cash was crucial to Okeke's success over time; second, a scheme need not involve "intelligence or expertise" to qualify as "sophisticated" under the enhancement; and third, Okeke's role as money launderer pointed to his "crucial role" in the overall web of fraud schemes. The district court adopted the recommended guidelines calculation, and sentenced Okeke to 45 months' imprisonment, along with supervised release and restitution.

## II. Discussion

On appeal, Okeke challenges the applicability of the sophisticated means enhancement. We review de novo the application of the guidelines, *United States v. Sheneman*, 682 F.3d 623, 630 (7th Cir. 2012), and we defer to the factual finding that a defendant employed sophisticated means unless that finding is clearly erroneous, *United States v. Robinson*, 538 F.3d 605, 607 (7th Cir. 2008). Under the clear-error standard, we affirm unless "left with the definite and firm conviction that a mistake has been committed." *Sheneman*, 682 F.3d at 630.

Okeke first challenges the district court's failure to make an express finding that his scheme involved "a greater level of planning or concealment" than the typical money-laundering scheme. According to Okeke, *United States v. Wayland*, 549 F.3d 526, 528 (7th Cir. 2008) stands for the proposition that such a finding is required. In *Wayland*, we approved the enhancement's application because the defendant's conduct was "far more intricate" than that in a "typical health care fraud scheme." *Id.* at 529. Here, Okeke insists, there is no evidence of how his money-laundering scheme compares to a typical one. Okeke first looks to Application Note 9(B), which sets forth these examples of sophisticated means: "[c]onduct such as hiding assets or transactions, or both, through the use of fictitious entities, corporate shells, or offshore financial accounts." Because, Okeke contends, he did not employ these particular artifices, the government needed to provide some "credible evidence" about, and the district court was obligated to explain, a typical money-laundering scheme and how his offense compared.

At first glance, it might seem difficult to determine whether a scheme involves a "greater" level of planning or concealment than a typical money-laundering scheme

without examining the nature of typical money-laundering. But we have never *required* an express discussion of the "usual" fraud scheme. *See, e.g., Sheneman*, 682 F.3d at 632 (offering no explanation of what constitutes the "garden-variety" mortgage-fraud scheme); *United States v. O'Doherty*, 643 F.3d 209, 220 (7th Cir. 2011) (including no discussion of the usual tax-evasion case); *United States v. Fife*, 471 F.3d 750, 753–54 (7th Cir. 2006) (same). Rather, we often rely on our judicial experience to determine whether a defendant in a fraud scheme used sophisticated tactics. *See O'Doherty*, 643 F.3d at 220; *Robinson*, 538 F.3d at 608 (where "[t]he district judge's observation that he had not encountered conduct like [defendant's] during his nine-year tenure strongly suggest[ed]" that defendant's conduct was not typical); *see also United States v. Hance*, 501 F.3d 900, 909–10 (8th Cir. 2007) (Hance's scheme was no different from "the multitude of other mail fraud cases"). We have also analogized a defendant's scheme to conduct deemed sufficiently sophisticated to warrant the sentencing enhancement. *See, e.g., United States v. Knox*, 624 F.3d 865, 871 (7th Cir. 2010) (analogizing defendant's scheme to a scheme where application of the sophisticated means enhancement was proper); *United States v. Allan*, 513 F.3d 712, 716 (7th Cir. 2008) (comparing defendant's scheme to the schemes in cases finding sophistication).

It is enough for a district court to explain what features of the defendant's conduct warrant the enhancement, without expressly describing a baseline scheme. Here, the district court gave several examples of Okeke's sophisticated efforts to evade authorities. For instance, Okeke would withdraw funds—"before the financial institutions could determine the transaction[s were] fraudulent"—in amounts below $10,000 to avoid the banks' reporting threshold. Okeke would often transfer the money to Onuama's account. At times, Okeke transferred the money to an offshore account. Okeke also used his business as a front, lying to bank officials that the suspicious transactions were car sales.

These tactics are no less deceptive than those used in similar cases in which this court has affirmed the use of the enhancement. For example, we found no clear error where a defendant, who protested that his mail fraud and tax evasion were "commonplace" in comparison to other cases applying the enhancement, repeatedly channeled money into foreign bank accounts, exchanged currency for cashier's checks to carry overseas, and laundered money through third-party bank accounts. *United States v. Ghaddar*, 678 F.3d 600, 602–03 (7th Cir. 2012). Those facts are analogous to Okeke's use of an offshore account, concealment of funds using cashier's checks to his business, and transfers to Onuama. Similarly, we affirmed the enhancement where

money laundering required "precision and coordination" with others, and the defendant misled mortgage lenders into financing properties above the actual value; here, Okeke's laundering required precise timing and coordination with Onuama, and Okeke misled bank officials about the purpose of large deposits to his account. *Knox*, 624 F.3d at 870–71.

The Guidelines' prescription of a similar enhancement to sentences under 18 U.S.C. § 1956, which governs money laundering, supports the finding that the sophisticated means enhancement applies here. Application Note 5(A) to § 2S1.1(b)(3) provides that "sophisticated laundering" typically involves the use of offshore financial accounts; two or more levels (i.e., layering) of transactions or transfers involving criminally derived funds that were intended to appear legitimate; fictitious entities; or shell corporations. U.S.S.G. § 2S1.1 cmt. n.5(A). Okeke's receipt of fraudulently obtained funds and subsequent transfers to Onuama's account and his use of an account in Nigeria bring his conduct within the ambit of these examples of "sophisticated laundering."

Okeke's remaining contentions do not persuade. Okeke argues that the district court erred by equating his case to *Wayland*. In *Wayland*, the defendant fraudulently registered a post office box and checking account, filed false tax returns, and submitted false documents to convince the Illinois Department of Rehabilitation Services that a nonexistent person was serving as the in-home personal assistant of the defendant's mother, who was incapacitated. There, we reasoned that the defendant's conduct warranted the sophisticated means enhancement because he manufactured the existence of a personal assistant; such conduct required greater planning or concealment than the typical health care fraud scheme. 549 F.3d at 527–29.

In Okeke's case, the district court remarked that his scheme was "not unlike" the scheme in *Wayland*, in that both schemes "involved a series of coordinated fraudulent transactions." That comparison is broad, but accurate. Okeke and the defendant in *Wayland* both deceitfully hid a fraud scheme. 549 F.3d at 528–29. In his allocution letter, Okeke admitted that he "knew that the money was illegally obtained." And as the district court noted, Okeke deceptively used his "seemingly legitimate car business as a front" to transform his "illegal gains into legitimate cash." Okeke is correct that in *Wayland*, a federal agent gave testimony about a "typical fraud of this kind." *Id.* at 529. The agent testified that health care fraud schemes typically involve inflating the hours worked by an in-home personal assistant, whereas the defendant in *Wayland* invented

an identity for an assistant who did not exist. *Id.* The agent's testimony strengthened the case for applying the enhancement, but the *Wayland* court did not impose a requirement that the district court hear evidence of what a typical scheme entails. *See id.*

Okeke also argues that the district court erroneously relied on his lies to the banks that contacted him about suspicious deposits into his accounts. Okeke contends that because he had no supporting documentation, his cover story—that the deposits were proceeds of car sales—was not a sophisticated effort at concealment. But a defendant employs sophisticated means if he takes "deliberate steps" to make the offense difficult to detect. *See O'Doherty*, 643 F.3d at 220. Okeke opened business accounts (not personal ones), and he told bankers that the deposits were car sales—lies that, even if easily discoverable, were intended to conceal his money laundering.

According to Okeke, the government mischaracterized the evidence to exaggerate the level of sophistication involved in his money laundering. Okeke challenges the government's assertion that he used structured transactions to conceal the scheme because his transactions in amounts above $10,000 involved twice as much money (totaling $283,173) as the amount involving transactions below $10,000 (totaling $113,395). But the *majority* of Okeke's transactions were in amounts under $10,000: 24 were for amounts under $10,000, while 12 were for amounts over $10,000. Okeke also points out that he did not uniformly withdraw the fraudulent proceeds within 48 hours of their deposit. But most of his counterexamples demonstrate a wait time of one or two more days, and rarely more than one week. This hardly refutes the district court's finding that Okeke consistently removed the money soon after it was deposited to avoid having it frozen as suspicious.[1]

Finally, Okeke argues that the district court impermissibly considered the underlying fraud schemes in finding that Okeke had engaged in sophisticated conduct. Okeke emphasizes that, since the 2015 edition of the Sentencing Guidelines, the

---

[1] Okeke contends in his opening brief that the government falsely stated that he used an offshore account. But, as the government points out, Okeke admitted in his allocution letter to the court that he helped get money "from a US account to a Nigerian account." At oral argument on appeal, Okeke's counsel contended Okeke only played a role in transferring money to an offshore account. According to counsel, Okeke's allocution letter admitted only that he "helped" others move money to an account in Nigeria; in other words, Okeke might not have been the transferor. We view that as an excessively literal reading; more importantly, it is also an interpretation that Okeke waived by not raising in the district court. *Walker v. Groot*, 867 F.3d 799, 802–03 (7th Cir. 2017).

enhancement has applied only to conduct that the "defendant intentionally engaged in or caused." U.S.S.G., supp. app. C, amend. 792. The district court perhaps approached the line when, as it addressed the enhancement, it described Okeke's "crucial role" as the launderer in the "larger web of sophisticated frauds" that he did not participate in directly; the district court further alluded to Okeke's "aware[ness] of the specifics of the underlying frauds." But the court primarily addressed sophisticated means that Okeke personally employed to conceal the money laundering, including the bank withdrawals and using his business as a front. Because the district court adequately addressed Okeke's use of sophisticated means apart from the larger "sophisticated frauds," the court did not base the increase on impermissible considerations.

### III.  Conclusion

For the foregoing reasons, we AFFIRM the sentence imposed.